Receipt No. 07633

ORIGINAL

FILED
JAN 15 2014
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

G-W MANAGEMENT SERVICES, LLC. )
                               )
        Plaintiff,             )
                               )
v.                             )   No.: 14-34C
                               )
THE UNITED STATES OF AMERICA,  )
                               )
        Defendant.             )
_____)

## COMPLAINT

Plaintiff G-W Management Services LLC ("GWMS"), by undersigned counsel, files this Complaint against the United States of America, appealing the decision rendered by the Albert Horvath, the Smithsonian Under Secretary for Finance and Administration dated November 15, 2013 (the "Smithsonian Decision") on a contract between G-W and Smithsonian, and stating claims for breach of contract and breach of the implied covenant of good faith and fair dealing. In support of this Complaint, GWMS states:

## JURISDICTION

1. This is an action for money damages arising out of GWMS' contract with the Smithsonian in connection with physical security improvements at the Smithsonian National Museum of American History ("Project"). GWMS hereby appeals the Smithsonian Decision dated November 15, 2013: (i) denying GWMS' claims for an equitable adjustment arising out of various differing site conditions and delays, (ii) upholding a counterclaim for certain credits raised by the Contracting Officer for the first time in the CO's final decision four years after the events at issue took place; and (iii)

1

refusing to provide GWMS with either a hearing or to refer this matter to the Civilian Board, which also constitutes a violation of the Disputes Clause of the Contract, as well as a violation of the implied duty of good faith and fair dealing.

2. Jurisdiction is conferred by 28 U.S.C. Sec. 1491.

3. The Disputes Provision of the Contract, "142. SI Disputes", reads in relevant part as follows, and expressly recognizes that a final decision by the Smithsonian may be appealed:

> The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary of the Smithsonian Institution. The decision of the Smithsonian Institution Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive *unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.*

(emphasis added).

4. Legal issues decided by the Smithsonian are subject to a *de novo* review by this Court.

5. As set forth in more detail below, the Smithsonian Decision is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial evidence and is in error as a matter of law. Moreover, the denial of due process is a breach of the Disputes Clause of the parties' contract and the implied covenant of good faith and fair dealing.

## PARTIES AND JURISDICTION

6. G-W Management Services, LLC is a Limited Liability Company, whose sole member is a citizen of the State of Florida, and whose principal place of business is located in the State of Maryland. GWMS is a general contractor engaged in various construction Projects in the District of Columbia area. GWMS is authorized to do business and is a licensed contractor in the District of Columbia.

7. Defendant, the United States of America, acting by and through the Smithsonian Institution (the "Smithsonian"), a trust instrumentality of the United States pursuant to 20 U.S.C. sec. 41 et seq., is authorized by law to enter into contracts for the procurement of goods and services.

8. The Smithsonian appointed Albert Horvath, Smithsonian Under Secretary for Finance and Administration as its duly authorized representative to decide appeals from the Contracting Officer's final decision under the disputes clause of the Contract.

## FACTS

9. On August 31, 2006, Contract No. F06CC10355 was awarded after competitive bidding to GWMS by the Smithsonian in the amount of $7,164,000 for the Project.

10. Two years later, in 2008, by Amendment No. 5, the Smithsonian added security walls at the Museum of American History by negotiation in the amount of $5,300,000.

11. By Amendment No. 11, dated August 4, 2008, the Smithsonian added the addition of a security wall as well as requiring exploratory test pits by the contractor in the amount of $126,750. The additional security wall ran parallel to Madison Drive, and

the exploratory test pits were to investigate the status, compatibility, and quality of the existing waterproofing on top of the higher elevation deck underneath this new security wall.

12.  On March 20, 2009, by Amendment No. 19, the Smithsonian added another expansion to the Museum of American History in the approximate amount of $3,001,049. The Smithsonian negotiated a change for GWMS to excavate, remove, and replace the existing waterproofing for the entire subterranean parking deck that runs parallel to Madison Drive, south of the American History Museum. It is this negotiated Amendment that is the center of this dispute.

13.  The purpose of Amendment No. 19 was to prepare portions of the underground parking facility so that it could subsequently be converted into a Child Care Center and was to receive the perimeter wall security on the south side of the American History Museum on top of the subterranean parking deck. The top of the parking deck had two elevations – one five feet below the finished grade of the landscaping above it, and the other portion of the top of the parking deck was eight feet below the finished grade of the landscaping. Amendment No. 19 also required waterproofing of the exterior wall of the underground parking facility in order to allow for blast proofing on the interior of this new Child Care Center.

14.  Contract Drawings A-8-03A, A-8-03B, and A-8-03C had a specific Note requiring the contractor to: "Remove existing concrete topping (<u>average</u> approximate thickness two inches)." (emphasis added).

15.  By Amendment No. 11, discussed above, issued on August 4, 2008, GWMS was instructed by the Smithsonian Institution to dig six two-foot by two-foot

"test pits" at the higher elevations of the subterranean parking deck that existed approximately five feet below the finished grade in order to explore the physical conditions of the underlying waterproofing material.

16.  These test pits were confined to the landscaping or grass areas and were outside the limits of the upturned concrete beams, approximately eight inches high and two feet wide. The test pits below the grass areas revealed approximately a two-inch thickness and a uniform concrete topping, in conformance with the drawing notes referred to above.

17.  The test pit verified at the upper level that the existing waterproofing material underneath the concrete topping was "healed" or fairly rigid in these test pit grass areas.

18.  In order to have access to the existing waterproofing material, GWMS drilled through the low strength concrete grout at the bottom of the six test pits in order to obtain small samples of the existing waterproofing material on the parking deck. The small samples retrieved of the existing waterproofing material taken at the test pit locations appeared to be uniformly rigid, dry and brittle or "healed" as the term is used in the industry.

19.  Based upon the information revealed to the parties by these test pits and drill holes, GWMS and the Smithsonian entered into Amendment No. 19, anticipating that the existing waterproofing could be readily removed by shot blasting or power washing, in that the existing pitch, that was fifty years old, was "healed" and rigid and was no longer fluid, pliable, or sticky.

20. The $3,000,000 price for Amendment No. 19 was negotiated with Loren Raap, GWMS' General Manager, based on the deteriorated waterproofing where the pitch that was applied some fifty years previously had now been healed, was rigid, and was no longer self adhering. It was also based upon an "average" of "approximately two inches" of thickness of the concrete topping above the waterproofing on the deck represented by the Smithsonian on the drawings.

21. In addition, GWMS encountered unsuitable wet clay material above the parking deck, which may have contributed to preventing the fifty-year-old waterproofing pitch from being completely healed and rigid. This unsuitable wet clay material retained moisture, especially at the lower elevations, which allowed the pitch to remain liquefied, pliable and elastic.

22. The top of the deck for the subterranean parking facility extended five feet from the surface at the higher elevations to eight feet at the lower elevations, the concrete walls and the air shafts of the parking deck extended thirty-five feet down from the surface elevation. It was, therefore, impossible to make a detailed site investigation of the exterior waterproofing at the air shaft level. It turned out that there was, in fact, thick waterproofing that existed on the vertical air shaft walls that was likewise difficult, if not impossible, to remove.

23. Contrary to the parties' expectations, GWMS encountered different physical conditions at the site that qualify as a Type I and/or a Type II Differing Site Condition.

24. GWMS encountered beneath the landscaped areas, backfill material that was unsuitable clay that was originally placed on top of the subterranean parking deck.

This material could not be reutilized as a subgrade under the new sidewalks, as it could not be compacted to the ninety-five percent modified proctor required by the specifications as appropriate backfill under sidewalks and other structures. In other words, after the first phase of earth was trucked off the site, the next three phases were to have the excavated material reused as backfill in a phased manner. It turned out that none of the contemplated backfill could be reused as it was unsuitable under structures and those areas had to be removed and replaced with suitable compactable material.

25. What the parties did not contemplate at the time of the negotiated Amendments No. 5 and No. 19, was that the unsuitable wet clay retained moisture, which passed through the porous concrete grout and kept the originally-applied waterproofing pitch in a moist condition so that it was unable to be healed.

26. The contract anticipated that the material above the lower portions of the deck had originally been compacted with suitable material that would allow any moisture retained in the compacted soil to dissipate into the ground over the warm hot summer months and not be retained as would a plastic clay material, which was actually encountered.

27. In June and July 2009 when the excavation was being performed in Phase 1, notice was given by GWMS to the Smithsonian that the concrete topping surface was averaging four inches, rather than the represented two inches, and that the original pitch could not be removed by shot blasting or pressure washing, in that these contemplated methods would not remove the waterproofing but would spread the unhealed waterproofing material that remained pliable over the underlying deck.

28. A meeting was held on July 20, 2009, discussing the Differing Site Conditions between Loren Raap and Smithsonian representatives. No decisions were made as to the method of proceeding, although the Smithsonian representatives were made aware of the conditions at the site and it was discussed that an investigation must be performed.

29. A subsequent meeting was held on July 22, 2009 with representatives of the Smithsonian, the Architect, the Design Engineers, and the waterproofing subcontractor, Conway Corporation, to review the physical conditions being encountered by the contractors and the difficulty in the removal of the existing waterproofing. After physical samples were obtained a year before the Smithsonian and the engineers retained a waterproofing consultant who made recommendations to utilize a new waterproofing replacement material that was, however, compatible with the existing coal tar pitch that was used fifty years previously.

30. When the problem of removing the existing waterproofing became apparent in June and July, GWMS and its waterproofing subcontractor arranged to have the manufacturer of the new waterproofing system visit the job on July 22, 2009 and both the manufacturer's representative and the Smithsonian's waterproofing design consultant agreed that the existing coal tar residue could remain and still be compatible with the new system.

31. The design consultants for the Smithsonian, however, insisted that <u>all</u> of the residue had to be removed down to the concrete deck, despite the manufacturer's and the consultant's recommendations that that the new waterproofing was compatible with the remaining existing pitch residue. The parties however thereafter all realized that it

was practically impossible to remove all the existing pitch residue without significantly damaging the underlying concrete deck. While the investigation was going on, the critical waterproofing installation work activities were suspended from the middle of June 2009 to the middle of September 2009. During this period of time, GWMS and its waterproofing subcontractor, Conway Corporation, attempted to remove the remaining residue, spending over a thousand hours. GWMS and its waterproofing subcontractor, Conway, resorted to using hand-held hammer chisels, but yet some of the waterproofing residue was impossible to be removed and some of the deck started spalling.

32. As early as July 2009, the Smithsonian Institution had actual notice of the Differing Site Conditions of the thickness of the concrete slab and that at the existing waterproofing pitch remained pliable, and not brittle, especially at the deeper elevations and was practically impossible to be removed. These conditions were completely contrary to the indications of the test pits taken six months earlier and which was incorporated into Amendment No. 11. The pliable nature of the pitch was also contrary to what would normally be expected for a fifty-year-old underground foundation waterproofing system.

33. With regard to the depth of the concrete topping on top of the subterranean parking deck, while the contract specifications for the amended drawings and specifications described: "an average approximate thickness of two inches," GWMS provided photographs with its appeal that demonstrate that a significant portion of the concrete was four to six inches in depth. Evidently, significant portions of the concrete deck have ridges that are upturned beams that are eight inches high. During the original construction of the deck, these ridges retained concrete topping that was four, six, or

eight inches tall. None of the soil investigations taken under Addendum No. 11 were in these areas, but were only taken, as noted above, in the landscaped areas where the ridges were not contained. In the area where the six test pits were done, the deck was flat without any upturned beams, and the thickness of the concrete in that area was approximately two inches. The portions of the deck that had ridges in it due to the upturned beams contained four to eight inches of concrete topping and were materially contrary to the indications taken from the test pits.

34. The thickness of the concrete where the upturned beams were located were four to eight inches. It is only in the flat areas where the thickness of the topping averaged a uniform two inches. In order to remove the thick concrete topping that averaged more than four inches, GWMS attempted to utilize large excavating equipment, i.e., a track excavator. Due to the precariousness and deterioration of the topping slab, the Smithsonian directed that only small excavating equipment (i.e., bobcats) be used on the deck, which took substantially more time to demolish and removing the topping slab. While the topping slab was being demolished in the summer of 2009, the installation of new waterproofing was being suspended until the removal problems were resolved.

35. It was not until mid-September of 2009, after spending more than 200 additional man hours attempting to remove the waterproofing in Area 1 that the Smithsonian finally accepted the manufacturer's recommendations to remove all waterproofing residue in Area 1 and allowed the pitch residue to remain. During this protracted investigation and dispute, GWMS' critical operations for installing the waterproofing in Areas 1 and 2 were on hold.

36. Until the manufacturer of the system agreed that leaving the residue in place would not void a twenty-year warranty, the Smithsonian agreed to have the operations continue. As a result, the waterproofing for Phase 1 was shifted from the summer of 2009 to the late fall of 2009. Unfortunately, the replacement waterproofing for Phase 2 was shifted from the late summer of 2009 to the dead of winter in 2009-2010, a six-month delay. The waterproofing installation was not complete until the end of March 2010 for Area 2, which would allow the backfilling of the entire deck. The schedule accompanying the original claim shows that this period of delay was 192 calendar days, or more than six months. See Activity A2262 and A2256.

37. It was only on September 9, 2009 when another meeting with the waterproofing membrane manufacturer was held when the manufacturer agreed to issue a twenty-year warranty on the installation that the Smithsonian relented and allowed the new waterproofing to commence, although the residue remained. It was recognized by all parties that the only way of removing the existing residue was to shave one inch off the concrete deck itself. The concrete deck, however, was significantly deteriorated and in poor condition and would not tolerate heavy equipment.

38. Smithsonian representatives were continuously aware of the differing site conditions and that the deck's structural integrity was susceptible to damage. In attempting to utilize jackhammers and heavy hand-held equipment to clear the pitch residue off the concrete, portions of the underside of the concrete deck spalled and fell onto parked cars. It became apparent that the continuation of this process would cause further deterioration and damage to the structural integrity of the underground parking deck itself.

39. At no time during performance did the Smithsonian ever raise that it wanted a credit for the non-removal of the remaining residue, which, as noted above, would have destroyed the remaining integrity of the concrete parking deck. The first time that GWMS or Conway was informed of a credit for not taking all the residue off the deck, was when the Final Decision was issued in this matter on July 17, 2013, four years after the events at issue took place.

40. On July 26, 2012, GWMS submitted a certified claim with the Smithsonian asserting in the amount of $542,709 based on differing site conditions and defective design encountered during performance of the waterproofing and excavation work, as discussed above.

41. On July 17, 2013, the Contracting Officer ("CO") issued its decision denying GWMS' claim in its entirety, and further found that the Smithsonian is entitled to a counterclaim allowing the Smithsonian to recover $245,546.69 from GWMS. The CO never previously mentioned any counterclaim prior to issuing this decision.

42. On Monday, September 16, 2013 GWMS mailed its timely appeal of the Contracting Officer's Final Decision in its entirety, along with an accompanying affidavit and exhibits. GWMS' appeal specifically requested that this matter be referred to the Civilian Board of Contract Appeals, or, alternatively, that "a hearing is requested before the Under Secretary in accordance with due process."

43. On September 16, 2013, the secretary of undersigned counsel called the Smithsonian to obtain the email address of Mr. Albert Horvath and of the Contracting Officer, so that the appeal could also be sent by email, in addition to mailing by U.S. mail. In response to inquiries by undersigned counsel's secretary, the Smithsonian

12

provided incorrect email addresses for Mr. Albert Horvath and the Contracting Officer. The incorrect email addresses were based on using the recipient's first and last name in the email address. The correct email address is actually the recipient's last name followed by their first initial. The correct email addresses were obtained on September 17, 2013, and GWMS appeal was resent by email to the Smithsonian on that date.

44. On November 15, 2013, the Smithsonian issued its denial of GWMS' appeal, and upheld the decision of the Contracting Officer in its entirety, including the Contracting Officer's counterclaim against GWMS.

## BASIS OF APPEAL

45. The Smithsonian's decision is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not support by substantial evidence and in error as a matter of law for the following reasons:

(a) The Smithsonian's finding that GWMS' appeal of the contracting officers' final decision was not timely is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial evidence and is in error as a matter of law. The COFD was dated and received by GWMS on July 17, 2013. The COFD stated that GWMS had 60 days to appeal the decision by "mailing" an appeal to the Smithsonian. Sixty days after July 17, 2013 is Sunday August 15, 2013, making the true deadline the next business or mailing day, August 16, 2013. GWMS timely mailed its appeal on August 16, 2013 via first claim mail. On August 16, 2013, the secretary for undersigned counsel also called the Smithsonian to obtain the proper email addresses for emailing GWMS's appeal. The Smithsonian provided GWMS with the wrong email

addresses. This error by the Smithsonian was corrected on August 17, 2013, and the appeal was resent by email on that date. The Smithsonian Decision erroneously and arbitrarily converted the "mailing requirement" to a "filing requirement" by finding that GWMS' appeal was not filed until the next day, August 17, 2013, when it was received by the Smithsonian.

(b) The Smithsonian's denial of GWMS' claims on the basis of notice is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial evidence and is in error as a matter of law. GWMS' appeal clearly stated that notice of its differing site conditions claim was given in various meetings starting in July 2009. Accompanying GWMS' appeal was an affidavit where, due to a typo that is obvious in context, the date of these meetings was erroneously stated to be "July 2010," instead of "July 2009." The Smithsonian Decision ignored the statement GWMS' appeal that these meetings occurred in July 2009 and instead relied on an obvious typo in an accompanying affidavit to unfairly, erroneously and arbitrarily determine that no meetings occurred in 2009 where notice was given by GWMS to the Smithsonian.

(c) The Smithsonian's denial of GWMS' claims on the basis of lack of evidence is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial evidence and is in error as a matter of law. GWMS provided sufficient evidence in its original claim filings, and its appeal and accompanying affidavit to support its claims. Moreover, and most importantly, GWMS requested that this matter be referred to the Civilian Board of Contract Appeals to allow a hearing on the merits, which would include the production of a

Rule 4 file, with supplementation by the parties, along with discovery. Alternatively, GWMS requested a "hearing before the Under Secretary in accordance with due process."

(d) The Smithsonian's upholding the CO's counterclaim for certain credits is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial evidence and is in error as a matter of law. The Smithsonian (through Albert Horvath, who does not appear to be an attorney) upheld the CO's counterclaim on the basis that *Roberts v. United States*, 174 Ct. Cl. 940 (Fed. Cir. 1996) is "no longer good law." *Roberts* held that claims for a downward equitable adjustment will be barred or waived if not submitted to the contractor in a reasonable time. Contrary to the Smithsonian Decision, *Roberts* has been repeatedly followed and is still good law. *See Southwest Engineering Co.*, NASABCA 4425-16, 68-1 BCA Par. 6977 (over two year delay in asserting claim); *Futuronics, Inc.*, DOTCAB 67-15, 68-2 BCA Par. 7079 (claim asserted over one year after appeal process commenced); *Lindwall Construction Co.*, ASBCA 23148, 79-1 BCA Par. 13,822 (claim asserted as a counterclaim in a contract appeal proceeding 13 months after Government knew of claim). Moreover, the case that the Smithsonian Decision cites for the proposition that *Roberts* is not longer good law, *Appeal of AshBritt, Inc.*, 2009-2 BCA Par. 34,276, ASBCA No. 56826, does not support that assertion.

(e) The Smithsonian's refusal to grant GWMS a hearing and transfer this matter to the Civilian Board of Contract Appeals is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not supported by substantial

evidence and is in error as a matter of law. The Smithsonian does not have adequate existing administrative procedures for providing due process in place to provide GWMS an opportunity to be heard and to offer evidence in support of appeals under the Disputes Clause.

46. Thus, the Smithsonian's decision in whole is arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, and not support by substantial evidence and is in error as a matter of law.

47. The Smithsonian's failure to provide a hearing, or to transfer this matter to the Civilian Board of Contract Appeals, is a breach of the contract's disputes provision as well as a violation of the implied duty of good faith and fair dealing.

## PRAYER FOR RELIEF

**WHEREFORE,** GWMS demands that the decision of the Smithsonian be reversed, that the Court find that GWMS is entitled to an equitable adjustment in the amount of $542,709 in time and money, plus interest and attorneys fees, and whatever other relief the court considers appropriate. Alternatively, GWMS demands that this matter be referred to the Civil Board of Contract Appeals for a hearing on the merits.

Dated: January 15, 2014

Respectfully submitted,

/s/ Herman Braude

Herman M. Braude, Esq. (FBN 148644)
BRAUDE LAW GROUP, P.C.
1200 Potomac St., N.W.
Washington, DC 20007
Tel:   (202) 471-5400
Fax:   (202) 471-5404
herman@braudelawgroup.com